UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JOHN R. PROVENZANO,                    )    NO. ED CV 09-1256-CT
                                       )
                Plaintiff,             )    OPINION AND ORDER
                                       )
        v.                             )
                                       )
MICHAEL J. ASTRUE,                     )
COMMISSIONER, SOCIAL SECURITY          )
ADMINISTRATION,                        )
                                       )
                Defendant.             )
                                       )
_____)

     For the reasons set forth below, it is ordered that judgment be
entered in favor of defendant Commissioner of Social Security ("the
Commissioner") because the Commissioner's decision is supported by
substantial evidence and is free from material legal error.


                      SUMMARY OF PROCEEDINGS

     On September 2, 2009, plaintiff, John R. Provenzano ("plaintiff"),
filed a complaint seeking judicial review of the denial of benefits by
the Commissioner pursuant to the Social Security Act ("the Act").  The
parties subsequently filed a consent to proceed before the magistrate
judge.  On November 10, 2009, plaintiff filed a brief with points and
authorities in support of remand or reversal.  On December 9, 2009, the

1  Commissioner filed a brief in opposition to the relief requested in the
2  complaint.

3

4                    SUMMARY OF ADMINISTRATIVE RECORD

5      1.   Proceedings

6      On February 4, 2003, plaintiff filed an application for
7  Supplemental Security Income ("SSI"), alleging disability since March
8  11, 2000 due to torn rotator cuff, cataract, asthma, chronic obstructive
9  pulmonary disease and depression. (TR 53).[1] The application was denied
10  initially and upon reconsideration. (TR 22-25, 29-32).

11      On November 21, 2003, plaintiff filed a request for a hearing
12  before an administrative law judge ("ALJ"). (TR 37). On May 26, 2005,
13  plaintiff, represented by an attorney, appeared and testified before an
14  ALJ.   (TR 255-79). The ALJ also considered vocational expert ("VE")
15  testimony. On August 3, 2005, the ALJ issued a decision that plaintiff
16  was not disabled, as defined by the Act because there are a significant
17  number of light jobs he can perform. (TR 11-17).

18      On August 22, 2005, plaintiff filed a request with the Social
19  Security Appeals Council to review the ALJ's decision. (TR 7). On
20  October 3, 2005, the request was denied. (TR 4). On October 25, 2005,
21  plaintiff filed a complaint in federal district court seeking judicial
22  review of the denial of benefits. On March 14, 2006, the court remanded
23  the case for further development of the record regarding the nature and
24  severity of plaintiff's mental impairment with an overlay of his history
25  of drug and alcohol abuse if applicable. (TR 311-22).

26  ──────────────

27      [1]    "TR" refers to the transcript of the record of
   administrative proceedings in this case and will be followed by
28  the relevant page number(s) of the transcript.

1    On remand, the ALJ held a second hearing and, thereafter, issued a

2  decision that plaintiff was not disabled, as defined by the Act because

3  there are a significant number of light jobs he can perform.  (TR 363-

4  71, 280-92).  Plaintiff, after exhausting his administrative remedies,

5  a second complaint in federal district court.  On January 11, 2008, the

6  court, pursuant to a stipulation between the parties, remanded the

7  matter.  (TR 403-05).

8    On July 31, 2008, a third hearing was held before an ALJ.  (TR 675-

9  700).  At the hearing, plaintiff, a medical expert, and a vocational

10  expert testified.  Thereafter, on February 18, 2009, the ALJ issued a

11  decision that plaintiff was not disabled, as defined by the Act because

12  there are a significant number of light jobs he can perform.  (TR 372-

13  86).  This complaint followed.[2]

14

15    2.  Summary Of The Evidence

16    The ALJ's decision is contained at pages 372-86 of the

17  administrative record and materially summarizes the evidence in the

18  case.  That decision is attached as an exhibit.

19

20                    PLAINTIFF'S CONTENTIONS

21    Plaintiff essentially contends as follows:

22  1.  The ALJ failed to consider the opinion of plaintiff's treating

23      psychiatrist and failed to fully develop the record;

24  2.  The ALJ erred in determining that plaintiff is capable of

25

26    _____

27  [2]  The court initially denied plaintiff's motion to proceed
    without prepayment of the filing fee because he provided
28  inconsistent statements under penalty of perjury.  (EDCV 09-977,
    Order, dated May 29, 2009).

3

1    performing the jobs of information clerk, courier, and cashier.

2

3                          STANDARD OF REVIEW

4        Under 42 U.S.C. §405(g), this court reviews the Commissioner's

5   decision to determine if: (1) the Commissioner's findings are supported

6   by substantial evidence; and, (2) the Commissioner used proper legal

7   standards.  Macri v. Chater, 93 F.3d 540, 543 (9th Cir. 1996).

8   Substantial evidence means "more than a mere scintilla," Richardson v.

9   Perales, 402 U.S. 389, 401 (1971), but less than a preponderance.

10  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997).

11       When the evidence can reasonably support either affirming or

12  reversing the Commissioner's conclusion, however, the Court may not

13  substitute its judgment for that of the Commissioner.  Flaten v.

14  Secretary of Health and Human Services, 44 F.3d 1453, 1457 (9th Cir.

15  1995).    The court has the authority to affirm, modify, or reverse the

16  Commissioner's decision "with or without remanding the cause for

17  rehearing." 42 U.S.C. §405(g).  Remand is appropriate where additional

18  proceedings would remedy defects in the Commissioner's decision.

19  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

20

21                            DISCUSSION

22       1.    The Sequential Evaluation

23       A person is "disabled" for the purpose of receiving social security

24  benefits if he or she is unable to "engage in any substantial gainful

25  activity by reason of any medically determinable physical or mental

26  impairment which can be expected to result in death or which has lasted

27  or can be expected to last for a continuous period of not less than 12

28

                                    4

1  months."  42 U.S.C. §423(d)(1)(A).

2      The Commissioner has established a five-step sequential evaluation

3  for determining whether a person is disabled.  First, it is determined

4  whether the person is engaged in "substantial gainful activity."  If so,

5  benefits are denied.

6      Second, if the person is not so engaged, it is determined whether

7  the person has a medically severe impairment or combination of

8  impairments.  If the person does not have a severe impairment or

9  combination of impairments, benefits are denied.

10      Third, if the person has a severe impairment, it is determined

11  whether the impairment meets or equals one of a number of "listed

12  impairments." If the impairment meets or equals a "listed impairment,"

13  the person is conclusively presumed to be disabled.

14      Fourth, if the impairment does not meet or equal a "listed

15  impairment," it is determined whether the impairment prevents the person

16  from performing past relevant work.  If the person can perform past

17  relevant work, benefits are denied.

18      Fifth, if the person cannot perform past relevant work, the burden

19  shifts to the Commissioner to show that the person is able to perform

20  other kinds of work.  The person is entitled to benefits only if the

21  person is unable to perform other work.  20 C.F.R. §416.920; Bowen v.

22  Yuckert, 482 U.S. 137, 140-42 (1987).

23      2.   Issues

24          A.   Treating Psychiatrist and Duty to Develop the Record
               (Issue 1)
25

26      Plaintiff asserts that the ALJ improperly rejected the opinion of

27  Krishna Murthy, M.D., who was plaintiff's treating psychiatrist.  Dr.

28  Murthy opined that plaintiff's depression rendered him incapable of

5

1  performing work between December 30, 2006 and October 1, 2007.

2      A treating physician's opinion generally is entitled to great

3  weight.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995)

4  (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)); Sprague

5  v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987).  "The treating

6  physician's opinion is not, however, necessarily conclusive as to either

7  a physical condition or the ultimate issue of disability."  Andrews v.

8  Shalala, 53 F.3d at 1041 (citing Magallanes v. Bowen, 881 F.2d at 751).

9  The weight given a treating physician's opinion depends on whether it is

10  supported by sufficient medical data and is consistent with other

11  evidence in the record.  See 20 C.F.R. §§ 404.1527, 416.927.

12      Notwithstanding this, the Commissioner must present "clear and

13  convincing" reasons for rejecting the uncontroverted opinion of a

14  treating physician and may reject the controverted opinion of an

15  treating physician only for "specific and legitimate reasons that are

16  supported by substantial evidence."  Id. at 830-31.  Accordingly, it is

17  error for an ALJ to implicitly reject the controverted opinion of a

18  treating physician without setting forth specific, legitimate reasons

19  for doing so.  See Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996);

20  Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995) (opinion of a

21  treating doctor, "even if contradicted by another doctor, can only be

22  rejected for specific and legitimate reasons that are supported by

23  substantial evidence in the record").

24      Here, the ALJ did not materially err in rejecting Dr. Murthy's

25  opinion because that decision conflicted with other credible medical

26  sources in the record.  First, Dr. Murthy's opinion conflicted with that

27  of Joseph Malancharuvil, Ph.D., the medical expert who testified at the

28

July 31, 2008 hearing in this matter and who reviewed all of the relevant medical evidence regarding plaintiff's mental impairment. (Id.).   Dr. Malancharuvil concluded that, aside from having to avoid safety operations, plaintiff could perform "moderately complex task[s]" with "up to four to five step instructions in a repetitive setting." (TR 680).   And aside from any physical limitations, plaintiff had "no other limitations."   (Id.).   As Dr. Malancharuvil was subjected to cross-examination, the ALJ could properly rely on his opinion in rejecting Dr. Murthy's contrary opinion.  See Andrews, 53 F.3d at 1042 (stating that ALJ should accord greater weight to nonexamining physician who testifies at hearing); citing Torres v. Secretary of Health & Human Servs., 870 F.2d 742, 744 (1st Cir. 1989) (greater weight may be given to opinion of nonexamining expert who testifies at hearing subject to cross-examination).

Second, the ALJ also cited the opinion of Jason H. Yang, M.D., a consultative examiner, whose opinion likewise conflicted with Dr. Murthy's opinion.   (TR 384).   Specifically, Dr. Yang opined that plaintiff could "focus attention adequately" and that plaintiff could perform both simple and complex tasks.   Dr. Yang also noted that plaintiff could withstand the stress of a working environment and interact appropriately with supervisors, co-workers, and the public. (Id.).

In finding plaintiff capable of performing work, the ALJ specifically stated that he was relying on Dr. Malancharuvil's opinion. (TR at 385).   That opinion rejected Dr. Murthy's limitations and incorporated the findings of Dr. Yang.   (TR 680-82).   In fact, Dr. Malancharuvil noted that Dr. Murthy's conclusions reflected only what

plaintiff told him and, moreover, lacked any psychological testing, whereas Dr. Yang had conducted a "classical psychiatric assessment." (TR 683).

Third, Dr. Murthy's opinion also conflicted with other medical evidence in the record.  For example, Ernest A. Bagner, M.D., a consultative examiner, opined that plaintiff would have "zero" to mild limitations maintaining concentration and attention and completing simple tasks.  (TR 640).  Further, Dr. Bagner opined that, with regards to completing complex tasks, plaintiff would have only mild to moderate limitations.  (Id.).  Dr. Bagner concluded that plaintiff would have "no limitations interacting with supervisors, peers, or the public." (Id.). Although not cited by the ALJ, the court notes that the state agency psychiatrist's opinion also directly conflicted with Dr. Murthy's findings regarding plaintiff's ability to work.  (TR 654-64).[3]

Finally, even if Dr. Murthy's opinion was credited, it would not show that the ALJ materially erred in finding plaintiff not disabled. As the ALJ noted, the period for which Dr. Murthy ruled out plaintiff working was less than a year.  (TR 383)(noting that Dr. Murthy opined that plaintiff would be temporarily disabled between December 2006 and October 2007).  To obtain social security benefits, plaintiff had to

---

[3] Plaintiff also faults the ALJ for failing to re-contact Dr. Murthy to have some of Dr. Murthy's more difficult to read treatment notes translated.  Assuming without deciding that the ALJ erred in this regard, the error was harmless.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1162 (9th Cir. 2008) ("[T]he relevant inquiry in this context is not whether the ALJ would have made a different decision absent any error, it is whether the ALJ's decision remains legally valid, despite such error.").  Irrespective of whether Dr. Murthy could translate his treatment notes, his overall conclusion was unsupported by psychological testing and, in any event, conflicted with the opinions of numerous medical sources in the record.

1 show that he was disabled for one year.  42 U.S.C. §423(d)(1)(A).

2     There is no material legal error here.

3

4     B.   Plaintiff's Ability to Work(Issue 2)

5     Plaintiff challenges the ALJ's reliance on the vocational expert's

6 testimony that plaintiff was capable of performing work as an

7 information clerk, a courier, or a cashier.  First, according to

8 plaintiff, the vocational expert's opinion regarding the physical

9 demands for each job conflicted with that of the Dictionary of

10 Occupational Titles ("DOT").   Second, the ALJ's ultimate finding

11 contradicted the ALJ's earlier finding that plaintiff is incapable of

12 more than occasional lifting above shoulder level, and it failed to

13 account for plaintiff's inability to read due to cataracts.  As to the

14 physical limitation, plaintiff complains that each of the identified

15 occupations requires frequent reaching, which, according to plaintiff,

16 conflicts with the ALJ's finding regarding plaintiff's limited ability

17 to lift above the shoulder level.

18     Although evidence provided by a VE "generally should be consistent"

19 with the DOT, "[n]either the DOT nor the VE . . . evidence automatically

20 'trumps' when there is a conflict.'"  Massachi v. Astrue, 486 F.3d 1149,

21 1152 (9th Cir. 2007); see also Social Security Ruling ("SSR") 00-4p.  If

22 a conflict between these exists, the ALJ must "determine whether the

23 [VE's] explanation for the conflict is reasonable and whether a basis

24 exists for relying on the expert rather than the [DOT]."  Id.

25     Here, the ALJ did not commit material error in finding plaintiff

26 capable of working as an information clerk, courier, or cashier.  First,

27 the vocational expert's opinion did not conflict with the DOT.   In

28

fact, the vocational expert testified that his assessment of the requirements for each job was consistent with the DOT. (TR 698). Plaintiff's argument assumes that "occasional lifting above the shoulder" is the same as "reaching." It is not, and the DOT does not state that any of the three jobs identified by the vocational expert – all of which involve light work – required more than occasional lifting above the shoulder level. See DOT 237.367-018 (information clerk); 230.663-010 (deliverer, outside); 211.462-010 (cashier). Accordingly, none of the jobs that the vocational expert identified conflicted with the ALJ's finding regarding plaintiff's physical limitations.

Moreover, the court notes that the medical evidence in the record does not suggest that plaintiff is incapable of frequent reaching. On the contrary, as the ALJ noted in his decision, two consultative examiners concluded that plaintiff had "full range of motion of the spine, extremities, and joints," limited only by "extreme motion." (TR 382). Indeed, the two consultative examiners opined that plaintiff was capable of a full range of medium work – work that requires much more physical abilities than the light work at issue in the jobs identified by the vocational expert. (TR 382).

Finally, the ALJ did not error with respect to plaintiff's purported inability to read due to cataracts. On the contrary, the ALJ explicitly found that plaintiff does not have a severe visual impairment. (TR 378). Plaintiff does not challenge this finding. Furthermore, the opinions of two doctors in the record support the ALJ's decision in this regard. (TR 382; 329). Indeed, on January 27, 2007, one doctor noted that plaintiff's vision was "unlimited"; the other, on January 12, 2008, assessed "no restrictions" on plaintiff's ability to

1   see.    (TR 329, 645).    And although notes from a 2003 examination

2   indicate that plaintiff will "eventually" need cataract surgery (TR

3   123), the ALJ noted that plaintiff's condition had not changed since

4   that examination.  (TR 378).  Moreover, although plaintiff contends that

5   he cannot drive, which would be required to work as a courier, the ALJ

6   noted that plaintiff had a valid driver's license and that he drove

7   himself to his psychiatric evaluation.  (Id.).  Regardless, at least two

8   of the occupations identified by the vocational expert do not involve

9   driving.

10      There is no material legal error here.

11

12                   CONCLUSION

13      After careful consideration of the record as a whole, the

14   magistrate judge concludes that the Commissioner's decision is supported

15   by substantial evidence and is free from material legal error.

16   Accordingly, it is ordered that judgment be entered in favor of the

17   Commissioner.

18   DATED:
19       12/17/09                 _____
20                      CAROLYN TURCHIN
                          UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28

375

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

| **IN THE CASE OF** | **CLAIM FOR** |
|---|---|
| John R. Provenzano | Supplemental Security Income |
| (Claimant) | |
| | 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 |
| (Wage Earner) | (Social Security Number) |

## JURISDICTION AND PROCEDURAL HISTORY

This case is before the undersigned Administrative Law Judge on remand from the Appeals Council pursuant to a remand from the United States District Court for the United States District Court, Central District. The claimant appeared and testified at a hearing held on July 31, 2008, in San Bernardino, California. Also appearing and testifying were Joseph Malancharuvil, Ph.D., an impartial medical expert and Troy L. Scott, an impartial vocational expert. The claimant is represented by Daniel Keenan, an attorney.

The claimant filed a subsequent application in 2007 and this application being considered duplicate is combined and considered within the decision herein.

Pursuant to the District Court remand order, the Appeals Council has directed the undersigned to reconsider the claimant's mental impairment in consideration of his use of alcohol and drugs and if necessary obtain a medical expert.

The claimant is alleging disability since March 11, 2000.

## ISSUES

The issue is whether the claimant is disabled under section 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

Although supplemental security income is not payable prior to the month following the month in which the application was filed (20 CFR 416.335), the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d).

After careful consideration of all the evidence, the undersigned concludes the claimant has not been under a disability within the meaning of the Social Security Act since January 22, 2003, the date the application was filed.

See Next Page



John R. Provenzano (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)                                    Page 2 of 12

**376**

## APPLICABLE LAW

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA (20 CFR 416.974 and 416.975). If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairments are and regardless of his age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, he is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 416.920(e)). An individual's residual functional capacity is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 416.920(e) and 416.945; SSR 96-8p).

See Next Page

**EXHIBIT**

John R. Provenzano (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)                                  Page 3 of 12

**377**

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of his past relevant work (20 CFR 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 416.960(b) and 416.965). If the claimant has the residual functional capacity to do his past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering his residual functional capacity, age, education, and work experience. If the claimant is able to do other work, he is not disabled. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 416.912(g) and 416.960(c)).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

1.   **The claimant has not engaged in substantial gainful activity since January 22, 2003, the application date (20 CFR 416.971 *et seq.*).**

2.   **The claimant has the following severe impairments: hepatitis "C"; status post rotator cuff repair; degenerative disc disease; peptic ulcer disease; chronic obstructive pulmonary disease; an affective disorder, not otherwise specified; a personality disorder, not otherwise specified; a seizure disorder; and a history of alcohol and drug abuse (20 CFR 416.921 *et seq.*).**

The listed impairments affect the claimant more than minimally; thus, they are considered to be severe. A more detailed discussion follows at step three.

The claimant has a diagnosis of chronic obstructive pulmonary disease, but as noted above he still continues to smoke heavily despite repeated counsel from his physicians to quit smoking and this has not changed since the prior decision (Exhibits 3F, pp. 18, 19; 4F, p. 1; 8F, p. 1 and 23F, p. 2). Although I have considered this a severe impairment, it is obviously not so severe that the claimant will followed prescribed treatment and quit smoking.

See Next Page

EXHIBIT

John R. Provenzano (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)                                      Page 4 of 12   **378**

The claimant has no severe visual impairment. Although the claimant has reported that he does not drive, he drove himself to the psychiatric evaluation on January 10, 2008 (Exhibit 27F, p. 1). The claimant obviously has a valid driver's license, and has no current treatment for any eye problem and again no current treatment for this condition  Findings would not have changed since his examination with ophthalmologist, Dr. Julia Valdez or the findings of the internal medicine examiners (Exhibits 2F, 16F and 28F).

**3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).**

The evidence does not support that the claimant has the severity of symptoms required either singly or in combination to meet or equal a medical Listing. A more detailed discussion to support this finding follows.

The claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.08. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant has mild restriction. In social functioning, the claimant has mild difficulties. With regard to concentration, persistence or pace, the claimant has moderate difficulties. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

See Next Page

EXHIBIT

John R. Provenzano (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)                                    Page 5 of 12

**379**

4.   After careful consideration of the entire record, the undersigned finds that the
claimant has the residual functional capacity to perform light work as defined in 20 CFR
416.967(b).  Specifically, the claimant can occasionally lift and or carry 20 pounds and
frequently 10 pounds; he can stand and/or walk six hours out of an eight-hour work day
and sit for six hours; he is limited to occasional climbing, balancing, stooping, kneeling,
crouching, and crawling; he is limited to occasional lifting above shoulder level with the
dominant left upper extremity; he is precluded from working at unprotected heights, or no
dangerous machinery; he should work in a clean air environment with no industrial
contaminants; he is limited to entry level work; and he is precluded from fast paced work
like work on a conveyor belt or piece work.

In making this finding, the undersigned has considered all symptoms and the extent to which
these symptoms can reasonably be accepted as consistent with the objective medical evidence
and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p.
The undersigned has also considered opinion evidence in accordance with the requirements of
20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in
which it must first be determined whether there is an underlying medically determinable physical
or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable
clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the
claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected
to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate
the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent
to which they limit the claimant's ability to do basic work activities.  For this purpose, whenever
statements about the intensity, persistence, or functionally limiting effects of pain or other
symptoms are not substantiated by objective medical evidence, the undersigned must make a
finding on the credibility of the statements based on a consideration of the entire case record.

The claimant has alleged disability based on a torn rotator cuff; cataracts; asthma; chronic
obstructive pulmonary disease; asthma; and depression.

At the recent hearing the claimant testified that he had been recently diagnosed with cirrhosis of
the liver.

The claimant testified that he had not used alcohol for over one year, September 2007 was the
last time he used.  The claimant said he stopped drinking after he had hepatitis "C".
The claimant alleged he had not used drugs in the past 15 years.  The claimant alleged that he
had recent tests done on his liver and he was diagnosed a month ago with cirrhosis of liver.

The claimant admitted he had been incarcerated for burglary and that had spent about 15 to 16
years in jail.  The claimant said he currently lived in a mobile home with his wife who receives
disability benefits because of arthritic hips.

See Next Page

EXHIBIT

John R. Provenzano (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)                                    Page 6 of 12

**380**

The claimant said he could not work because he had no education and he could not drive due to seizures.[1] The claimant alleged that his last seizure was about six months ago. He described that he shakes and it lasts for about a minute or a minutes and one-half. The claimant said his medication was increased and he worried about dying. The claimant said he was not on parole, he had no medical insurance and he sees Dr. Murphy monthly and is given Trazadone.

The claimant said that most of the past work he did was as a janitor and he last worked in 2000. The claimant said that he took Trazadone because he cant sleep. The claimant said he was worried about bills. He said he feels tired all the time, but he can't sleep. The claimant said he was recently diagnosed with bleeding ulcers and he had surgery at St. Mary Hospital. The claimant said he tried to kill himself in 2007, but not recently. The claimant said that his brother drove him to the hearing. He added that he has not looked for work in the last two years.

The claimant's testimony credibly establishes no different conclusions than found herein. His earnings record show that he has no significant attachment to employment at any time in his life. His last work ended with an industrial injury in March 2000, for which he received a $16,000 settlement (prior testimony decision dated May 31, 2007, pp. 5-6).

At a prior hearing the claimant asserted shortness of breath, but still smokes. His assertion of trying to stop is completely undocumented in the medical records. He asserted pain in the right shoulder and upper extremity that was worse after surgery, back pain, gastroesophageal reflux disorder, Hepatitis C, weakness, and poor vision. He admitted that his driver's license was renewed in August 2002 without restrictions but for lenses.

I have reviewed the comments by the claimant and his wife in the E file. The claimant's wife, Victoria Provenzano, reported that the claimant listened to television and played with and took care of their dogs (Exhibit 3E, pp. 1, 4). She admitted that he prepared simple meals and went outside the home two to three times a day. She alleged that he did not drive even though he had a valid driver's license (Exhibit 3E, pp. 2, 3). She alleged that the claimant had trouble being around people including his family, but then stated that he visited family and friends once a week (Exhibit 3E, p. 5).

The claimant's wife is not a medical professional and as a lay witness she is not competent to make a diagnosis or argue the severity of the claimant's symptoms in relationship to his ability to work. According to the questionnaire, she has only income from disability and therefore money is a concern. She has a financial and familial interest in seeing the claimant receive benefits and her opinion is not an unbiased one. Most importantly, even if her assertions are taken at face value, they do not establish that the claimant cannot work under the residual functional capacity found herein (Exhibit 6F, p. 9).

The claimant's admissions are similar, he said he could not use his right arm or see because of cataracts, but stated that he walked around the yard without help. He also alleged he could not be around crowds, but visited family and friends at least once a week. He admitted that he cared

---

[1] The claimant drove to a consultative appointment as recently as January 10, 2008 (Exhibit 27F, p. 1).

See Next Page



**381**

for his pets, watched television, went out of the home a couple of times a day, and prepared simple meals (Exhibit 4E).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The prior decisions are incorporated by reference and the decision dated May 31, 2007 is the decision on remand as supplemented herein (Exhibit 2A and 3A).

The claimant has in total conservative treatment records that still support problems related to alcohol abuse since the prior decisions dated August 3, 2005 and May 31, 2007 (Exhibits 32F, 26F, 1f, 18F, pp. 1-22 and 19F, p. 1).

The claimant's test results on May 16, 2007, show normal heart and lungs despite asserted chest pain (exhibit 26F, pp. 93-104).

The claimant was admitted on July 4, 2007 with complaints of shortness of breath and discharged on July 5, 2007(Exhibit 26F, pp. 80-92). It was noted that there was alcohol on his breath and he had a history of hepatitis "C" and COPD (Exhibit 26F, pp. 80-81). The claimant was diagnosed with acute alcoholic intoxication, exacerbation of chronic obstructive pulmonary disease, pneumonia and a history of Hepatitis "C". The claimant was instructed to stop smoking, but his stay in the hospital was noted as otherwise unremarkable (Exhibit 26F, p. 79).

On July 5, 2007, after allegations of shortness of breath a chest x-ray showed congestion but a normal heart (Exhibit 26F, p. 91).

On August 27, 2007 there was evidence of mild degenerative disc disease of the lumbar spine at multiple levels (Exhibit 22F, p. 2).

The claimant was treated for low back pain and a lumbar spine MRI showed degenerative disc disease on September 22, 2007 (Exhibit 26F, pp. 66-78). The claimant was given Vicodin.

On September 25, 2007, the claimant complained of chest pain again and diagnostic tests including a computerized tomography pulmonary angiogram was benign except for showing degenerative vertebral spondylosis of the thoracic spine (Exhibit 26F, pp. 41-63).

On October 2, 2007 the claimant complained of general weakness and a possible seizure on assessment, however, he admitted he was out of medication and not taking dilantin (Exhibit 26F, pp. 28- 34). On October 19, 2007 the claimant was treated for back pain with Vicodin once again (Exhibit 26F, pp. 2-27).

The claimant was seen for stomach pain through the month of May and on May 27, 2008 the claimant had laparoscopic cholecystectom (Exhibit 24F, pp. 34-35). The claimant had

See Next Page

EXHIBIT

John R. Provenzano (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)                                        Page 8 of 12

**382**

esophagagogastroduodenoscopy on May 28, 2008 (Exhibit 24F, p. 32). He tolerated all procedures well and was discharged home on May 29, 2008 in stable condition (Exhibit 24F, p. 25). The claimant was advised again to quit smoking.

On June 16, 2008 and again on June 23, 2008 the claimant had a computerized tomography of the abdomen after complaints of abdominal pain (Exhibit 24F, p. 23, and 22F, pp. 8-9). The claimant had degenerative changes of the spine and findings consistent with liver cirrhosis and mild ascites. His final diagnosis was abdominal pain secondary to duodenal erosions on the second portion. He was given Prilosec for treatment and advised to continue taking the Prilosec at home.

On July 25, 2008, the claimant was treated for abdominal pain and diagnosed with cirrhosis of the liver and advised again to stop drinking (Exhibit 23F, p. 2).

The claimant has been recently diagnosed with cirrhosis of the liver with evidence of mild ascites (Exhibit 23F). At the prior hearing the claimant had a diagnosis of Hepatitis C, But there were no clinically detectable hepatic stigmata, and liver enzymes were not severely altered (Exhibit 3F, pp. 21-32).

The claimant does not follow prescribed treatment which includes taking his medications as well as quitting alcohol and smoking. Despite non compliance, the current evidence does not support that the claimant is undergoing any kind of interferon treatment or that he has severe symptoms from this condition at this time.

The form completed at exhibit 16F, pages seven through ten has no persuasive value and was probably completed in error. The limitations contained in it are simply unsupported by the internal medicine examination itself or by anything else of record.

The most recent consultative internal medicine examination is dated January 12, 2008 and was performed by Dr. To, Board eligible internal medicine (Exhibit 28F, pp. 1-6). The clinical results and findings are similar to those of Dr. Fabella dated a year earlier (Exhibit 16F). Both of these examiners noted that the claimant was not in any acute distress, had good grip, vision and clear lungs. The claimant had no muscle atrophy, and full range of motion of the spine, extremities and joints, but Dr. To reported pain upon extreme motion. Dr. Fabella found no restrictions and Dr. To thought the claimant could do essentially a full range of medium work with the following non exertional limitations: the claimant would be precluded from working with heavy and moving machinery, temperature extremes, moisture, fumes or dust particles.

The State agency thought the claimant could do light work with a preclusion from pushing and pulling and no work in an environment with heavy concentrations of respiratory contaminants (Exhibit 33F, pp. 1-2).

The scant treatment evidence prior to January 2007, shows that by history, the claimant suffered an on-the-job injury to his right shoulder in April 2001. On June 3, 2002, the claimant's workers compensation doctor determined the claimant was permanent and stationary and prophylactically restricted the claimant from lifting, pushing, and pulling of heavy objects as

See Next Page

EXHIBIT

well as repetitive work at or above shoulder level.  He thought the claimant could not return to his janitor job.  It is noted that the findings herein are consistent with Dr. Wood's findings (Exhibit 1F, p. 9).

In April 2003, the consultative orthopedic specialist, Dr. Warren David Yu examined the claimant and reviewed his medical records (Exhibit 4F).  Dr. Yu found no gross atrophy of the right shoulder.  There was tenderness over the anterior shoulder and slightly over the biceps. The claimant's left shoulder was normal. Range of motion of the elbows and wrists were within normal limits and motor strength and sensation in the upper and lower extremities was grossly within normal limits.  Dr. Yu diagnosed right shoulder pain, status post surgery.  Dr. Yu opined the claimant could occasionally use overhead with the right upper extremity, and lifting on the right should be limited to 20 pounds occasionally and 10 pounds frequently (Exhibit 4F, p. 4).

In June 2003, consultative examiner, Dr. Concepcion Enriquez, came to similar conclusions as discussed above (Exhibit 8F).

The light limitations adopted herein take into consideration all limitations suggested by the consultative examiners, State agency review physicians as well as the actual clinical and diagnostic test results.

Regarding the claimant's mental impairment, the evidence supports that the claimant has used alcohol and marijuana after the alleged date of onset as reflected in the mental health records (Exhibits 3F, pp. 11, 18; 4F, p. 1; 8F, p. 2, 26F, pp. 80-92 and 23F, p. 2).

The record is void of any mental health treatment between 2003 and January 2005 and again from 2005 through May 30, 2006 (Exhibit 18F).

Dr. Krishna Murthy completed an assessment of the claimant's mental limitations in May 2005, stating the claimant was moderately restricted in areas of functioning (Exhibit 15F).[2]

I do not give this opinion significant weight and find even more reasons to do so based on the lack of treatment from 2005 to 2006 and the current minimal treatment.

For similar reasons, I reject the statement of disability at exhibit 19F based on depression (Exhibit 19F, p. 1).  The signature is not legible and the declarant only states that the claimant would be temporarily disabled from December 2006 through October 2007.  This does not meet the 12 month rule for disability and there is no explanation as to why this medical professional is finding the claimant disabled in the future when he has been in treatment since May 30, 2006 according to treatment notes (Exhibit 18F, pp. 1-22).

Regarding the claimant's mental condition and his ongoing use of alcohol, I received testimony from the medical expert Dr. Malancharuvil.  Dr. Malancharuvil, Ph.D., a specialist in clinical psychology, reviewed the medical records prior to the hearing, Exhibits 1F through 25F and was

---

[2] Even if the claimant had moderate limitations, moderate as described under HA 1152-U3 in a form dated June 2006, is defined as more than a slight limitation in this area but is still able to function satisfactorily.

See Next Page



aware that the time period at issue was from the alleged date of onset of March 11, 2000 with a filing date of January 22, 2003. Dr. Malancharuvil testified via telephone.

Dr. Malancharuvil testified that based on the medical file there was no evidence to support that the claimant met or equaled a medical Listing. However, the medical expert testified that the claimant had a long standing history of multiple drug use, heroine, methamphetamines, PCP, marijuana and alcohol (Exhibit 6F, p. 5). Dr. Malancharuvil said that it appears the claimant has recently quit using drugs, but at least alcohol still remains a problem.

Dr. Malancharuvil testified that the claimant had an affective disorder, not otherwise specified, under 12.04, and a personality disorder, not otherwise specified under 12.08. The medical expert stated that these conditions, even considering alcohol caused the following "B" criteria: mild difficulty with activities of daily living; mild to moderate difficulty with concentration, persistence and pace mild difficulty with social functioning. He testified that there was no evidence of any episodes of extended duration of decompensation and criteria "C" was not met.

Dr. Malancharuvil said that these conditions would cause the following limitations. The claimant could do moderately complex tasks with four to five steps of instructions, and he should avoid safety operations.

Dr. Malancharuvil said the claimant's file supported significant past history with substance abuse and alcohol problems, but at least recently the claimant by report has resolved as time has passed on.[3]

Dr. Malancharuvil reported that on February 2007, the psychiatric consultative examiner, Dr. Yang, examined the claimant in detail and his clinical findings were consistent with the findings herein (Exhibit 27F, p. 4). According to Dr. Malancharuvil, Dr. Yang thought the claimant had a depressive disorder, not otherwise specified, rule out alcohol abuse, but Dr. Yang concluded that the claimant could do simple and complex tasks and was cleared to be able to do work.[4]

Dr. Malancharuvil testified that in reviewing the treatment records, including exhibit 18F, there were no inconsistencies in the medical records (Exhibit 18F).

Dr. Malancharuvil responded to questions from the claimant's counsel that the medical treatment records showed that the claimant was essentially staying the same. The medical expert said that Dr. Yang's assessment was detailed and appeared to be consistent with the legible treatment records regarding his mental status evaluation.

Dr. Malancharuvil testified that there was no evidence or diagnosis of a psychotic condition and the medication prescribed, Seroquel, was prescribed for multiple other reasons for mental

---

[3] Dr. Malancharuvil considered the claimant's past and current use of alcohol and drugs when coming to his conclusions.
[4] Dr. Yang gave the claimant a GAF score of 72/100. A GAF score between 61 and 70 means the claimant has some mild symptoms, but generally functioning pretty well. A GAF score between 71 and 80 means the claimant has no more than slight impairment. The Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, 1994, pp. 30-32

See Next Page

EXHIBIT

**385**

patients. Dr. Malancharuvil testified that based on the evidence in the record there was no evidence of a seizure disorder.

I have given greatest weight to Dr. Malancharuvil, the medical expert regarding the claimant's mental impairments. His opinions are not inconsistent with the treatment records, medical source opinions and give the claimant every reasonable benefit of doubt (Exhibits 31F and 27F).

**5.   The claimant is unable to perform any past relevant work (20 CFR 416.965).**

The vocational expert reviewed the claimant's vocational file and was present for the claimant's testimony. Based on the limitations noted herein he testified that the claimant could not do his past relevant work.

**6.   The claimant was born on August 8, 1956 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).**

**7.   The claimant has a limited education and is able to communicate in English (20 CFR 416.964).**

**8.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).**

**9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11).

When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decision-making unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.17 and Rule 202.10. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge

See Next Page

John R. Provenzano (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)                                    Page 12 of 12

**386**

asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as an information clerk, a courier and a cashier. The information clerk is a light, unskilled job that exists in the regional economy in numbers of 4,600 and in the national economy in numbers of 90,000. The courier is a light, unskilled job that exits in the regional economy in numbers of 5,400 and in the national economy 8in numbers of 87,000. The cashier positions are unskilled light jobs that exist in the regional economy in numbers of 69,000 and over one million in the national economy.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rules.

**10. The claimant has not been under a disability, as defined in the Social Security Act, since January 22, 2003, the date the application was filed (20 CFR 416.920(g)).**

<u>**DECISION**</u>

Based on the application for supplemental security income filed on January 22, 2003, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

/s/ *Jay E. Levine*
_____
Jay E. Levine
Administrative Law Judge

February 18, 2009
_____
Date

nmc

